Case number 20-1219 Bobby Kooman et al. versus Boulder Bluff Condominiums et al. Arguments not to exceed 15 minutes for the plaintiff and 15 minutes to be shared by defendants. Mr. Davis, you may proceed for the appellants. Thank you. Good afternoon, your honors. May it please the court, Mark Davis on behalf of Bobby Joe Kooman as personal representative for the estate of Robert Roemig and Terry Roemig appellants. This case was incorrectly decided and should be overturned because this position is going to affect how disabled persons are getting, are able to receive modifications or accommodations from condominium associations. The way that this is going to help sort of firm that process up. Mr. Roemig was growing old and infirm and after discussions with his family, he decided to move back in with his ex-wife, Terry Roemig, in a condominium in Boulder Bluffs. She agreed to provide assistance for his disabilities and his infirmness. Mr. and Mrs. Roemig made a request to have a rail put on their front porch because Mr. Roemig had fallen off of the porch on a couple of other occasions and he had a difficult time being able to navigate the stairs going up and down. A request was made and then ultimately it was denied. Eventually, after the Roemigs retained counsel, they did eventually receive permission to put the porch rail on, but that was after Mr. Roemig had suffered a fall where he broke his hand, was left in serious pain and he had a long rehabilitation period after that happened. This matter was originally filed with Michigan Claims under the Persons with Disabilities Civil Rights Act and the Federal Fair Housing Act. The district court judge severed those claims. The state claims are still pending. The fair housing claims is the with this court. It's an appeal for a wrongly decided Rule 56 motion for summary judgment on behalf of both appellees, Boulder Bluff condominiums, and GRU management. Mr. Davis, what's the first time there's written evidence that he has a disability, that he's disabled, in other words, disabled under the Fair Housing Act? Well, I guess just to answer that question, when's the first time they get written evidence of that? There were a number of emails that went back and forth between certain board members and Mr. and Mrs. Roemig and the board members themselves and the property manager that indicated that Mr. Roemig was infirm and also had certain email where it says he has a disability. What date? It would have been pre-July 1st letter during the deliberations between the first on June 17th and the July 1st letter when it went out. There was an email from Mr. Carpenter that was done to the board members stating that Mr. Roemig was infirm and that that's why he needed to have a railing. So why is being elderly and infirm prove you're disabled? Well, your honor, because Mr. Carpenter had actually had conversations and met with Mr. Roemig and talked with Mr. Roemig before and the disabilities were pretty evident in watching him being able to move and walk around. He walked with a walker or a cane on a walker. A cane or a walker proves you're disabled? I think it's certainly evidence of that, your honor. I mean, I think it certainly could make the, it's not difficult to make that jump. What was the date that the doctor's note was received? Pardon me, your honor? What was the date that the doctor's note was received? The doctor's note came with the letter from my office in late July, your honor. I mean, in this particular instance, there were a number of indications that this matter was for a disabled person. The initial phone call from Ms. Kuman, she testified to that in her sworn testimony that she told Ms. Bogali, the property manager, that she was asking for this on behalf of her father on account of a disability. There were the emails that I had mentioned before from Mr. Carpenter to the rest of the board. You said on account of disability, even in the oral conversation, she used the word disability? I don't know if she used the exact word disability, your honor, but she mentioned that it was for to assist her father. I mean, whether she would use that exact term, I can't say for sure, but she did mention that it was for her father because of the fact that he had previously fallen off the porch. She did say that she used the word disability after the fact. Is that correct? Pardon me, your honor? I think she did say that it was based on a disability when she characterized the phone call later. That may very well be, your honor. I mean, I don't, and I apologize for not knowing exactly, but I know that's what she relayed to Ms. Bogali, the property manager. And then, as I said, those were further bolstered by, you know, Mr. Carpenter's email. There was another board member, Mr. Wakalas, that stated it was on account of Mr. Romig's advanced age. And then there was also the email from the property manager to all the board members that stated that, you know, that if they didn't approve this, that it was her opinion that they would face possible litigation, you know, for failing to allow such an accommodation for a disabled individual. How do you respond to their argument that this was a fluid situation in the sense that she presented a timetable that was, you know, pretty abbreviated, I guess, around the 4th of July weekend. And so one way of thinking about it is the initial denial wasn't a final denial, as suggested by the fact that at that point they asked for a doctor's note, which, you know, why would you ask for a doctor's note if you were done with the matter? So how do you respond to that argument? They never asked for a doctor's note on the July 1st correspondence, your honor. It just said we're denying your request for an accommodation. It didn't say anything about when did they ask for a doctor's note. They never did. There was a follow-up call immediately following the denial by the homeowner's representative that said, get us a doctor's note. And I think that my memory is, and I think that we can work this out. Is that incorrect? That's certainly not my understanding, your honor. My understanding is there was no further correspondence after the July 1st letter until after the Boulder Bluff was contacted by my office, which would have been late July. Why did you get the doctor's note? Pardon me? Because obviously we weren't going to get any sort of traction without it. But, okay. I thought there was, maybe it was just an oral communication, but I thought the way it worked is you had different people with different responses to it. And I thought one individual responded the way Judge Stranch said that, you know, we might be able to work this out if we have a doctor's note and that would help. And I thought that's what led to the doctor's note. No, your honor. I don't, there was, to my knowledge, there was no discussions along those lines. Okay. The denial in and of itself was, it was full disclosure. It was, you know, we are not, we're not doing this. We're not entertaining. Matter of fact, if you look later on in the mid-July board minutes for the association that are part of the record, somebody during the that meeting said, this is not our responsibility. I questioned all the board members during their depositions regarding that. And they all seem to recall that they all agreed that if it made it into the minutes as a quote, that that was indeed said during that meeting, but nobody was willing to claim it, your honor. So I don't believe that the board thought that they had any sort of obligation. Certainly at that point, which would have been mid-July to gather any more information. And was that statement about who paid for it or whether they would, it's not their responsibility to approve. I, nobody, nobody was willing to claim it, your honor. There was never any question about who was going to pay for it. That happened pre-July 1st letter. That was the first question that was asking my client who's going to pay for this. And she immediately, you know, agreed that, she understood that that wasn't going to be at her cost. Did you first invoke section 3617 of the Fair Housing Act amendments in your opening brief on appeal? Was that the first time and not below? That was that, well, the, the argument had always been that, that the management company violated the Fair Housing Act. The invoking 3617 was, was, was done to, to narrow the issues, your honor. But that, that may have been the first particular reference to that section. But you, but your position is that you had brought the Fair Housing Act claims that would incorporate that? Correct, your honor. Thank you. What would have, how would this case have worked out if the board had said, we don't grant these requests with a doctor's note at the outset? Would that have been a permissible answer and therefore required them to reject the initial putting of this handrail in over the 4th of July weekend? Would that have been okay if they just said, hey, we don't do this without a doctor's note and therefore we have to postpone this initial schedule? I believe that would have been acceptable, your honor. All right. I think your time is up. Thank you, Mr. Davis. You'll get your full rebuttal. So I'll let whoever's going first go. Thank you, your honor. Good morning, your honors. Drew Broadus for Boulder Bluff Condominium Association, Appalee. Plans Council started off with the suggestion that this was an important case jurisprudentially for the interpretation of the statute, but I submit it's not. It's a very fact-specific holding. And to understand the district court's ruling and why it's accurate, it requires a much more specific look at the timeline than what Brother Council has given. And when we look closely at that, we see that this begins with a telephone discussion with the property management around, we'll say, June 15th, 2016. We never really got a firm date on that. That was the oral discussion where the disability is allegedly mentioned. I would note that the district court assumed for the sake of summary judgment that the conversation took place and as plaintiff described it. But nonetheless, what we do know from that is she was instructed to submit a written request and this is not disputed. And what we do know from that also, what we don't know, what there's no evidence of is to what way that was relayed to the Boulder Bluff Association. So that first request is not reduced to writing until June 17th. We have the email. Everyone agrees this email, June 17th, has no reference to a disability. It's just describing the rail that they want to install. They don't say why. There's a request for more information on June 20th that's met with some more information about the specifications of the rail. But again, no discussion of the disability. It's under consideration from the 20th to the 28th of June of 2016. We received word of a fall on June 28th. We received word again of a fall on the 29th of June. Not clear if those are two separate falls, but we do know is that both or that one fall that's reported twice would not have been prevented by plaintiff's proposal. Again, plaintiff's initial proposal was to get this done sometime the week of July 4th. So there's no delay. There's no, there's nothing we could have done faster that would have prevented those incidents. This case talks about immediate approval is not a requirement to be reasonable. So we have that. We have the formal denial on July 1st. There was some discussion here that formal denial on July 1st doesn't request a doctor's note. And I'll accept for the summary judgment argument that there was a point where we asked for that. But that's because we had no reason to believe it would have been relevant to the request. Again, as, excuse me, as Judge Sutton's comments alluded to, there's no written documentation that a disability is in play for quite some time later. I don't believe it's in writing until the attorney letter on July 28th. But as it may, we get a letter and we act upon that. We get a letter from a doctor. It's dated July 7th. It was suggested that this was sent in late July, but to look closer at the record, you see, we don't get that until August 3rd. And although that's a few days discrepancy, it's a significant discrepancy because what that does is it narrows down our timeline significantly. And if you look at the summary judgment transcript page 34, it's acknowledged that you did not get that letter until August 3rd. It's approved by August 23rd. That, again, just a very, very short turnaround time from the point that we realized there's an actual claim for a disability accommodation as opposed to just a rail that someone feels would be helpful. So when you put all that together, none of which is anything to be decided by the jury, you have quite a firm basis for dismissing the suit on the accommodation claim. Now, we have some other claims. We have the disparate treatment claim that requires evidence of intent. And the same timeline that establishes the reasonableness of our processing of the accommodation also establishes the absence of intent to discriminate. And as the trial court correctly noted, there was evidence in the record that we've approved other requests for disability accommodations, which undermine that claim. And then third, we have the disparate impact claim, which was raised for the first time on appeal. It requires proofs that are nowhere in this record because a disparate impact claim is going to require evidence that other people in this person's situation were treated poorly by the board's policies. And that record just doesn't exist. There wasn't an attempt to make it exist. And this was a summary judgment response. The plaintiff wanted that sort of evidence or felt that it had been adduced in discovery. That was the time to put it forward. And it's really not even alluded to on appeal. It's simply the relevant part of the statute is cited and some case law is cited about disparate impact. But there's no attempt to connect the legal standard with this record because it was never worked up that way. So it's kind of doubly unpreserved. It's unpreserved because the legal... Counsel, I wonder, maybe you just don't have this obligation, but I wonder why in July 1st, when you rejected this, you shouldn't have said something along the lines of, we know he's unfirm. We know he has problems. He's fallen, but we don't have any evidence of a disability. And until we have that, we're not going to grant this or think about it through the lens of the Fair Housing Act. Why isn't it incumbent on the association to ask for a note at that point formally? Well, my take on this record, and I think it's similar to the district judges is when you look at what has been submitted in writing to that point, there's never been a resident has said in writing, this is a disability accommodation. So we're not... I thought some of the board members had discussed, I know this guy, he's over and unstable, and we have other people in our condominium association that are going to be like that soon or already are, and we've allowed them to put them in. There was the suggestion that he may be disabled, and some people on the board were discussing that among themselves, but there's never a point prior to the attorney letter where this resident affirmatively says this is being sought for a disability. They're emailing each other about ideas that each other had based on what they observed in the neighborhood and discussions they've had, but none of that flows from anything that the plaintiff had submitted in writing. All they'd seen in writing was this request for a rail and some specifications about the rail, and then somehow in that discussion, the idea comes up, this seems to be a disability, possibly he's disabled. I'm not even sure they use the word disabled. There's just a recognition that he's got some mobility limitations, but none of that flows from what the plaintiff had put in writing as far as I can tell and as far as the district court could tell, and that's why I think it's appropriate on July 1st when we've denied this that there's no mention of it because there's no mention of it from the plaintiff's perspective in writing up to that point either. There are also some case law on the act from this and other circuits that suggest that as soon as you deny an accommodation, it does not matter. That's the issue point. It does not matter after that whether remedies are granted later. The key would be your letter denial date. I'm not sure exactly which cases hold that, but I would look back to what the district court said about this topic, which was you can have a constructive denial by not denying, by dragging out the process and delaying, delaying, delaying. In this case, we've turned that on its head, but what we have is almost a constructive non-denial when we get this doctor's letter and then revisit the entire thing and give them what they want within a few weeks period. I guess in some sense, you could say we made a denial on July 1st, but then you frame their case from this delay from June 17th to July 1st without reference to the fact that we don't see the doctor's note for another month, and then at that point, we submit it in three weeks. I think that if the cases that have suggested otherwise, that you're stuck with your first denial, probably to some extent turn on reasonableness what happens to the timeframe after that, because I don't think you can look at this record and just say, well, you denied it. It's done, because then the fact that it was approved is kind of what would be the point of looking at it again. It would have a chilling effect on decision makers revisiting their decision. Say, well, we're getting sued anyway. We've already violated the act. Why go back? Probably the difference is a policy issue that you want to resolve those as quickly as possible and not place people in the position of having to go out and hire counsel to make it happen. Right. Well, it's not clear that she needed to hire counsel to make this happen. Distinguishing the driving factor from that point from the counsel letter was the counsel letter gave us a doctor's note, too. I think that's more important than hiring counsel. The doctor's note, coincidentally, although we don't have the record that says when we asked for it, she got the doctor's note four days after the denial. We didn't get it for another month. Clearly, at some point, the idea was put out there that doctor's note would have made a difference. I don't know that that required hiring counsel. She did hire counsel in the meantime. It's unfortunate that she felt that was necessary, but I don't think she needed an doctor's note. And I don't have anything to add to my brief and to the district court's analysis, so I guess it looks like I'm out of time. I'll defer to the co-defendant. All right, Mr. Benson. You might have pushed the wrong button. Yeah. All right, we'll defer to the co-defendant, Mr. Benson, to make a motion to adjourn the hearing. Mr. Van Der Veen, can you hear me? Your microphone is on mute, sir. He may be constructively giving back his time to you, Mr. Broaddus. Your Honor, I'm going to attempt to send Mr. Van Der Veen a chat message. Thank you. Can the court hear me now? Yes. Great, thank you. I apologize. No worries. Since I probably only have two minutes left, I'm going to keep my comments very brief here. I would like to address the plaintiff's reliance on the admission protection and adequacy case that they've cited in their reply brief in support of their position that they have a claim against my client under section 3617. First of all, unlike the present case, the plaintiffs in admission protection actually did allege a section 3617 claim. As Mr. Davis just acknowledged, in our case, the plaintiffs had never even mentioned section 3617 until they filed briefs with this court. Admission protection was a suit against a group of neighbors who contributed money to purchase a home, which was going to be the granting of summary judgment in favor of the neighbors. Even though there was interference on the part of the neighbors, it wasn't interference within the meaning of the Fair Housing Act. The court in admission protection noted that 3617 encompasses things such as racially motivated firebombings, sending threatening notes, and practices such as that they're relying on supporting their claim that section 3617 encompasses a type of ministerial act that general management did in this case. So even if the plaintiffs had alleged a 3617 claim, which they didn't, but if they had, the district court would have been correcting granting summary judgment on that claim. Other than that, your honors, I'm going to be relying on my brief, unless the court has any questions for me. Thank you. Mr. Davis, do you have your rebuttal? You need to put your mic on. I apologize. Still getting the hang of this Zoom thing. I understand. During Mr. Brown's presentation, he kept using the term, they never had anything in writing, never had anything in writing, never had anything in writing. But the fact of the matter is the standard under Hollis from this court says that whether or not the violator under the Fair Housing Act knew or should have known that the accommodation was made on behalf of a disability. At a minimum, there's certainly a question of fact as to whether they knew or should have known. There were a number of factors, the initial call from Ms. Kuhlman, the carpenter emails, not to beat a dead horse, the other board members emails, and the property manager's email that certainly brings that question into contention and makes it an issue that if it's viewed certainly in the light most favorable to the appellants, that that's certainly a question of fact as to whether they knew or should have known that it was made on behalf of a disability, your honors. The problem with that then that the Homeowners Association representative did not convey what was verbally stated, is that the basis of the argument that sufficient information was provided not in the email but in the call? Yes, your honor. She told her at the time, the problem was that she didn't further convey that. She wasn't told she needed to. She said it was on behalf of a disability for her father and all she was told was that she had to put the request in writing. There was never any request for a doctor's note. There was never any instructions from the managing agent to say, look, you need to make sure that you point out that this is on behalf of a disability. Those things never happened. My client called, she made the request and she proceeded as she was told to by putting it in writing. The other things took place sort of in and of themselves from Mr. Carpenter. Those were, for lack of a better term, organic from his observations and his interaction with the other board members. The same thing with Mr. Wacolas. I think that the one that it was on behalf of a disability because she told the board they were going to get sued if they didn't grant it because of that. Yet she never mentioned to Mr. Romig or Ms. Kuhlman that the thing that was going to be a stumbling block or the thing that was necessary was a doctor's note or further documentation of a disability. I must say the best practices certainly would have been for the homeowners association to describe that, but you can also understand their perspective being we're trying to make this non-legalistic and why is it our obligation to tell them how to perfect their claim? I know what would have been the better thing to do, but I'm not sure it's the legally required thing to do. Your honor, I believe that if she had been told that she needed to know her disability, it would certainly have made it less legalistic than it is at this point. It would have been a lot less legalistic if she'd given the doctor's note to the association as soon as she got it. I understood your honor, but my understanding is that one of the reasons why she went and got the doctor's note was on advice from counsel and that she at that point in time essentially left that in our hands to deal with. I see that my time is up. Thank you, your honors. I appreciate your time. Thank you to all three of you for your helpful briefs and arguments. We're quite grateful the case will be submitted.